UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,               CR. NO. 16-20492

v.                                    HON. VICTORIA A. ROBERTS

KENNETH MIXON,

        Defendant.

_____/

**SUPPLEMENTAL BRIEF IN SUPPORT OF KENNETH MIXON'S PETITION FOR COMPASSIONATE RELEASE**

**I.    Introduction**

The undersigned, on behalf of Kenneth Mixon (hereinafter "Mr. Mixon"), now presents a supplemental brief in support of Mr. Mixon's petition for compassionate release. Mr. Mixon's petition rightfully focuses upon the threat of the COVID-19 pandemic to his health, with particular focus upon the conditions at his current facility and the several preexisting health conditions he suffers from. While the undersigned's brief will expand upon Mr. Mixon's health related argument, it will also discuss the arbitrary, unwarranted filing of the 18 U.S.C. § 924(c) mandatory minimum in this case, with specific attention given to the racialized, overly punitive application of said charge. The fact that one of Mr.

1

Mixon's codefendants engaged in similar conduct, but was spared from facing § 924(c) charges speaks to the aforementioned arbitrariness and the unjustified sentencing disparities which result.

As this court is undoubtedly aware, it is now imbued with greater discretion to ascertain what constitutes "extraordinary and compelling" circumstances. Specifically, within the last few months this judicial circuit has held that courts are no longer bound by the limited categories of "extraordinary and compelling" circumstances delineated in U.S.S.G. § 1B.1.13. *See United States v. Elias*, No. 20-3654 (6th Cir. Jan. 6, 2021); *see also United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020). In light of this new standard governing compassionate release, the undersigned respectfully asks this court to find "extraordinary and compelling" circumstances warranting compassionate release based upon the unwarranted mandatory minimum charged in this case and the ongoing threat of COVID-19 to Mr. Mixon's physical and mental health.

## II. The Court has Discretion to Define "Extraordinary and Compelling"

As a general rule, "a federal court may not modify a term of imprisonment once it has been imposed.'" *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release." *Ibid.* "The request may come

through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A). Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). Mr. Mixon relies on subparagraph (i) of the statute. Under that provision, the Court can order a reduction of a sentence, even to time served, by following a procedure that the court of appeals has distilled into three steps. *First*, consider whether "extraordinary and compelling reasons warrant such a reduction." *Second*, determine if the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Third*, "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." *United*

States v. Ruffin*, 978 F.3d 1000, 1004-06 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)).

The Sentencing Commission's policy statement to be considered under step two is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (en banc) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it"). That has led the court of appeals in its evolving guidance on the subject to hold that district courts should dispense with step two when the motion for compassionate release comes from a prisoner and not the BOP. *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020) ("We now join the majority of district courts and the Second Circuit in holding that the passage of the First Step Act rendered § 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release.") (citing *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020)).

Recently, the court of appeals took the explanation a step further. In *United States v. Elias*, --- F.3d ---, No. 20-3654, 2021 WL 50169 (6th Cir. Jan. 6, 2021), the court ascribed Congress's amendment of section 3582(c)(1) to the BOP's

4

"rare[]" exercise of its power to move for sentence reductions, that "the program was plagued by mismanagement," and that "the BOP' ha[d] no timeliness standards for reviewing…requests." 2021 WL 50169 at *1 (quoting United States v. Brooker, 976 F.3d 228, 231-32 (2d. Cir. 2020)). *Elias* reaffirmed *Jones's* holding "that § 1B1.13 is not an applicable policy statement for compassionate-release motions brought directly by inmates, and so district courts need not consider it when ruling on those motions." *Id.* at *2. It then held that "in the absence of an applicable policy statement for inmate-filed compassionate- release motions, district courts have discretion to define 'extraordinary and compelling' on their own initiative." *Ibid.*

Recently, courts in this district have granted compassionate release based upon the expanded basis for "extraordinary and compelling" reasons outlined in *Elias*. *See United States v. McDonel*, 2:07-cr-20189-DML-RSW, Dkt. No. 254 (E.D.Mich. Jan. 13, 2021). Additionally, courts have found that compassionate release may be warranted due to the "heightened susceptibility of prison populations to the coronavirus." *See United States v. Barber*, 6:18-cr-00446-AA, Dkt. No. 55 (D. Or. May 12, 2020); *United States v. Huntley*, 1:13-cr-0119-ABJ-1, Dkt. No. 263 (D. D.C. May 5, 2020); *United States v. Fischman*, 4:16-cr-00246-

5

HSG-1, 2020 WL 2097615 (N.D. Cal. May 1, 2020); *United States v. Johnson*, 1:17-cr-00482-JSR-1, Dkt. No. 116 (S.D. N.Y. May 1, 2020) (Rakoff, J.)

### III. Exhaustion Requirement

Mr. Mixon proffers that on or about December 14, 2020, he made a request for compassionate release to the BOP. As of the date of this writing, the BOP has failed to respond to Mr. Mixon's request. 30 days have elapsed since Mr. Mixon's request to the BOP and accordingly, Mr. Mixon has satisfied the exhaustion requirement.

### IV. The Inherently Flawed Structure of 18 U.S.C. § 924(c) and its Unwarranted Application Against Mr. Mixon Resulted in a Disproportionately Harsh Sentence.

An analysis of Mr. Mixon's sentence illustrates the fundamentally flawed nature of mandatory minimums and the inevitable racial disparities which result from them. In Mr. Mixon's case, the Government filed an 18 U.S.C. § 924 (c) charge, which carried a five year mandatory minimum to run consecutive with his guidelines. As a result, Mr. Mixon, who's criminal history was a Category I, faced a guideline range of 97-106 months. While the parties agreed to a sentence of 60 months, such a sentence is substantially higher than the guideline range of 37 to 46 months that Mr. Mixon would have faced had the § 924 (c) charge not been filed.

The filing of § 924(c), like most mandatory minimums, depends upon the discretion of the assigned prosecutor. An assessment of the federal criminal system establishes that where broad discretion is granted, bias will inevitably permeate the manner in which laws are enforced. To fully appreciate why Mr. Mixon's charge is unwarranted, one must begin with the decisions that came before the filing of § 924 (c). Mr. Mixon was arrested for possession of a controlled substance and firearm. Racial disparities permeate both offenses, as African Americans use and sell drugs at comparable rates to whites, yet are arrested and charged at higher rates.[1] Furthermore, an analysis of gun indictments establishes that African Americans are more likely to be charged federally for illegal gun possession than a white individual who commits the same offense.[2] This same double standard extends to the decision to charge § 924 (c). Analysis of recent data established that African American defendants accounted for 48% of offenders who qualified for a charge under § 924(c), but 56% of those who were charged with a § 924(c) and 64% of those who convicted of a § 924(c). U.S. Sent'g Comm'n, *Fifteen Years of Guidelines*

---

[1] *See* Fellner, Jamie (2009). Race, Drugs and Law Enforcement in the United States. Stanford Law and Policy Review; *see also* Knafo, Saki (2013). When it Comes to Illegal Drug Use, White America Does the Crime, Black America Gets the Time. Huffington Post.

[2] *See* Bonita Gardner, Separate and Unequal: Federal Tough On Guns Program Targets Minority Communities for Selective Enforcement, 12 Mich. J. Race & L. 305, 316 (Spring 2007).

*Sentencing* at 90 (Nov. 2004). Moreover, Black offenders were "subject to the mandatory minimum penalty at sentencing, and were convicted of multiple counts of an offense under section 924(c), at higher rates than offenders with other demographic characteristics." U.S. Sent'g Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice* System, at 274 (Oct. 2011); *see also* Starr, Sonja B., "Racial Disparity in Federal Criminal Sentences." University of Michigan Law School Scholarship Repository. 2014.  In fiscal year 2010, 20% of offenders subject to § 924(c) were White, and 55.7% were Black. Of those convicted of multiple counts, 15.1% were White and 61.0% were Black. *Id*. The fact that black defendants receive sentences that are 19.1% higher than comparable white defendants is no surprise considering the aforementioned disparities.[3] While the undersigned does not pretend to know what the government's motivations were in this case, the aforementioned statistics establish that race undoubtedly plays a central role in the decision to charge a 924 § (c) enhancement. The role of race in charging decisions results in the sort of selective morality that is inimical to an equitable criminal justice system and must be taken into consideration when assessing whether extraordinary and compelling circumstances exist.

---

[3] *See* United States Sentencing Commission "Demographic Differences in Sentencing: An Update to the 2012 Booker Report (November 2017).

In addition to the unwarranted disparities resulting from the filing of § 924 (c), said charge precluded the court from properly taking into account pertinent 18 U.S.C. § 3553(a) factors at sentencing. In Mr. Mixon's case, his criminal history is relatively benign in comparison to many federal defendants. The bulk of Mr. Mixon's criminal history consists of possession charges which were the unfortunate result of a long standing cocaine addiction. *See* Presentence Report (hereinafter "PSR"). Further, Mr. Mixon had no prior offenses involving firearms or crimes of violence. Mr. Mixon also showed that he possessed potential to be a productive citizen, as he worked a living wage machinist job for roughly two years prior to his sentencing with no violations of bond. This court was unable to give said factors their appropriate weight, as it was handcuffed by the filing of § 924 (c).

Of equal salience, the filing of § 924 (c) precludes the court from taking into account the manner in which the firearm was actually used. Here, Mr. Mixon did not utilize a firearm to threaten or engage in violence, he merely possessed it. However, § 924 (c) takes no account of the significant differences in gun use, resulting in a situation where an individual who never actually touches or uses a firearm faces the same punishment as one who brandishes or uses a gun.

Moreover, one must accord weight to the arbitrary nature of the charging decision in Mr. Mixon's case. Case in point, Mr. Mixon was charged along with two

9

other co-defendants, Walter Taylor and Darius Clark (hereinafter "Mr. Clark"). Mr. Clark's conduct in the offense mirrors that of Mr. Mixon, as both parties possessed a firearm on their person in furtherance of a drug transaction. However, Mr. Clark received the appropriate level of clemency, as he was sentenced to time served after serving a short period in pretrial custody. The charging decision in Mr. Clark's case perfectly illustrates the arbitrary nature of mandatory minimum charging decisions. While the undersigned has no qualms with the sentence imposed against Mr. Clark, such a sentence speaks to the problem of vesting prosecutors with authority over the enforcement of mandatory minimums. Mr. Clark was fortunate enough to have a prosecutor who recognized the excessively punitive nature of the § 924 (c) penalty, and was willing to remedy it by dropping said count. Mr. Mixon was not so fortunate. Thankfully, this honorable court can now partially remedy this injustice.

Finally, under Section 2D1.1(b)(1) of the guidelines, Mr. Mixon could have received a two point enhancement for a dangerous weapon, as opposed to the five year mandatory minimum that accompanies § 924 (c). The dangerous weapon enhancement would have resulted in a guideline range of 46-57 months as opposed to the 97-106 month guideline faced by Mr. Mixon. An analysis of the PSR reveals no justification for the filing of § 924 (c) as opposed to the dangerous weapon enhancement. In fact, Mr. Mixon's lack of prior gun or violent convictions

supported the lesser enhancement. Such a decision further corroborates the argument that the unbridled charging discretion granted to prosecutors inevitably leads to charging decisions rooted in reasons unrelated to fairness.

### V. COVID-19 Continues to Pose a Serious Threat to the Physical and Mental Health of Mr. Mixon.

As this court is undoubtedly aware, the COVID-19 pandemic has been almost unprecedented in terms of the danger it poses to the prison population. Within the past few months, a new, more contagious mutation of COVID-19 has begun spreading throughout the United States. According to the CDC, said mutation spreads more easily and quickly than other variants of COVID-19, posing a renewed, greater risk to populations.[4] As this court undoubtedly knows, COVID-19 has ravaged the BOP, with 200 inmates succumbing to an untimely death and over 43,000 inmates infected.[5] As of this writing, 354 inmates, or approximately 42% of the inmate population at Ashland Federal Correction Institution (where Mr. Mixon is incarcerated) have tested positive for COVID-19, with six inmates succumbing to an untimely death.[6] Several inmate deaths at Ashland have occurred within the last

---

[4] See Emerging SARS-CoV-2 Variants. Centers for Disease Control. Jan. 3, 2021. www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html.
[5] See bop.gov/coronavirus/.
[6] Id.

11

two months, reflecting the uptick in COVID-19 cases seen in the United States during the winter/holiday season. *See* Exhibit A and B.

Per Mr. Mixon's proffer, inmates at Ashland are unable to properly social distance, and mask wearing is often inconsistent amongst inmates and staff. Mr. Mixon further proffers that he shares a cell with another inmate and due to the tight dimensions of said cell, he is unable to practice social distancing. There is often a paucity of soap, as the supply provided to Mr. Mixon's unit is refilled only once a week. Accordingly, inmates will run out of soap after a span of three or four days, leaving inmates without soap for days at a time. Finally, Mr. Mixon has observed staff moving back and forth between different units within Ashland.

Furthermore, Mr. Mixon proffers that the Ashland administration is not conducting consistent, facility wide testing at its facilities, nor is it conducting testing of transient staff once they return to work. Accordingly, Ashland, like the vast majority of BOP institutions, has no accurate count as to how many individuals are actually infected, and no thorough process to ensure that returning staff aren't carrying the virus. One can see the manifestation of the inability and/or unwillingness of the BOP to fully address the dangers of the prison environment, as COVID-19 is infecting inmates in the BOP at nearly five times the rate of the general population. *See* Exhibit C. In light of Ashland and other prisons serving as

incubators for the spread of COVID-19, the reality of a new COVID-19 variant further increases the already great health risks faced by inmates.

Moreover, Mr. Mixon's obesity must be taken into consideration. Mr. Mixon proffers that he is currently 5'7 inches with a weight of 210 pounds, giving him a body mass index (hereinafter "BMI") of 32. A review of Mr. Mixon's health records establishes that he weighed 201 pounds in February of 2020, indicating that his BMI has increased. Beyond the fact that a BMI of over 30 places one at increased risk for serious symptoms or death, recent CDC guidance establishes that as BMI increases so does one's risk of death from COVID-19.[7] Additionally, Mr. Mixon's most recent health records indicate that his blood pressure is at an elevated level, further exacerbating his risks of suffering serious symptoms from COVID-19.

It must also be noted that the deleterious, long term effects of COVID-19 are still being understood. There is a tendency to look at COVID-19 from a binary standpoint of either survival or death. However, the reality is that COVID-19 may have devastating long term health effects on its survivors causing damage

---

[7] Obesity, Race/Ethnicity and COVID-19, Centers for Disease Control and Prevention. Jan. 13, 2021. https://www.cdc.gov/obesity/data/obesity-and-covid-19.

to the heart, brain and lungs.[8] While a vaccine has recently been approved for COVID-19, the distribution of said vaccine has been glacial in nature, and inmates are not considered to be top priority, despite the large number of outbreaks throughout the BOP. [9]

While the physical risks posed by COVID-19 are undoubtedly serious, the undersigned would be remiss in not addressing the very real absence of mental health/psychological treatment for inmates in the BOP. Since early 2020, Mr. Mixon proffers that he has been unable to participate in any mental health programming to help acknowledge and address the derivation of his conduct. Due to COVID-19, the vast majority of BOP programming has been canceled or postponed at Ashland, and all indications point to COVID-19 still posing a threat to prisoners in 2021. The absence of mental health treatment is further exacerbated by the prohibition of visitors at Ashland, which has precluded Mr. Mixon from having much needed in person contact with loved ones. In such an environment, it is simply impossible for inmates to work towards any real rehabilitation. Such a situation is inimical to the purpose of sentencing, which is to provide the defendant "with needed…medical care…in the most effective

---

[8] *See* Dr. Anthony Fauci Warns of COVID-19 Long Term Effects (August 20, 2020), https://spectrumnews1.com/ky/lexington/news/2020/08/20/dr--anthony-fauci-warns-of-covid-19-long-term-effects; *see also* From Brain Fog to Heart Damage, COVID-19's Lingering Problems Alarm Scientists ( July 31, 2020)
[9] Rabin, Roni (Dec. 2, 2020). Prisons are Covid-19 Hotbeds. When Should Inmates Get the Vaccine? New York Times.

manner." *See* 18 U.S.C. § 3553(a)(2)(D). Should Mr. Mixon be released, he intends to immediately enroll in Narcotics Anonymous to address the addiction and mental health issues that contributed to his current predicament.

### VI. Mr. Mixon Does Not Pose a Danger to the Community and 18 § 3553(a) Factors Favor His Release

Mr. Mixon comes before this court a rehabilitated man and takes ownership of his previous failings. Mr. Mixon's criminal history is stale in nature, with the vast majority of his priors occurring in his early twenties. As was previously stated, most of Mr. Mixon's offenses were petty possession cases that derived from an unaddressed addiction, and none of his priors involved firearms or acts of violence. Further, Mr. Mixon was allowed to be on pretrial release prior to sentencing, where he conducted himself in an exemplary manner and procured sustained, living wage employment. *See* PSR.

While incarcerated on the current offense, Mr. Johnson has taken significant steps to reform and better himself so that he may be a productive citizen upon his release. Prior to the COVID-19 outbreak, Mr. Mixon completed nine courses in the BOP, covering such salient matters as drug abuse, fatherhood and accounting. *See* Exhibit D. As evidenced by his accomplishments in the BOP and the absence of

issues during pretrial release on this case, Mr. Johnson's past is not indicative of who he is today.

Mr. Mixon has completed more than 75% of his sentence and is scheduled to be released to a halfway house in June of 2021. *See* Exhibit E. If released, Mr. Mixon intends to reside with his wife who is aware of the supervised release conditions imposed by the Court, and is ready and able to ensure Mr. Mixon's compliance. Additionally, Mr. Mixon intends to seek employment with his former company, J.G. Kearns.

Finally, the undersigned anticipates that the Government may reference Mr. Mixon's PATTERN score. PATTERN is an algorithm created pursuant to the First Step Act as a means for the BOP to determine an inmate's risk. An analysis of PATTERN reveals that is a highly problematic means to determine risk, as it "has yet to be independently validated, as required by the First Step Act." *See* Jerrold Nadlera & Karen Bass Press Release, Subcommittee on Crime, Terrorism and Homeland Security (Mar. 30, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2893. Especially concerning for African Americans like Mr. Mixon is the fact that "many questions remain about PATTERN's validity because of possible racial/ethnic and

gender bias and because of the tool's overemphasis on static factors such as criminal history." *Id.*

## VII. Conclusion

For the aforementioned reasons, this Court should grant Mr. Mixon's motion for compassionate release. The amount of time served by Mr. Mixon in this case is more than sufficient, and greater than necessary. Requiring Mr. Mixon to serve an additional five months at Ashland serves no rehabilitative purpose and poses a potentially lethal threat to his health. Specifically, Mr. Mixon requests that this court impose a sentence of time served, or alternatively, place Mr. Mixon in home confinement for the remainder of his sentence.

            Respectfully submitted,

            **FEDERAL COMMUNITY DEFENDER**
            **EASTERN DISTRICT OF MICHIGAN**

            s/Leon A. Parker
            LEON A. PARKER
            Attorney for Defendant
            613 Abbott St., Suite 500
            Detroit, MI 48226
            Phone: 313-967-5542
            leon_parker@fd.org

Dated:  January 20, 2021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,      CR. NO. 16-20492

v.            HON. VICTORIA A. ROBERTS

KENNETH MIXON,

    Defendant.
_____/

## CERTIFICATE OF SERVICE

This certifies that on January 20, 2021, the foregoing paper was electronically filed with the Clerk of the Court using the ECF system, which will send notification to all parties of record.

            **FEDERAL COMMUNITY DEFENDER**

            s/Leon A. Parker
            LEON A. PARKER
            Attorney for Defendant
            613 Abbott St., Suite 500
            Detroit, MI 48226
            Phone: 313-967-5542
            leon_parker@fd.org

Dated: January 20, 2021